# Use of Marshals, Troops, and Other Federal Personnel for Law Enforcement in Mississippi

The problems of using large numbers of federal civilian law enforcement personnel in Mississippi are more practical than legal. So long as they confine themselves to investigation and prosecution of federal crimes, there is no legal problem. The practical problem is whether their presence serves to aggravate the emotions of the populace or alienate local law enforcement officials.

On the factual assumption that there is a complete breakdown of state law enforcement as a result of Klan activity and Klan connections with local sheriffs and deputies, the President could, as a legal matter, invoke the authority of sections 332 and 333 of title 10 to use military troops in Mississippi. There is considerable information available that could be used to support that assumption as to some areas in Mississippi. But in view of the extreme seriousness of the use of those sections, the government should have more evidence than it presently has of the inability of state and local officials to maintain law and order—as a matter of wisdom as well as of law.

July 1, 1964

MEMORANDUM FOR THE PRESIDENT[*]

There are considerable pressures from civil rights groups and from some members of Congress to station federal personnel in Mississippi as a method of preventing further acts of violence against civil rights workers there. These proposals range from those which urge, in effect, the occupation of Mississippi by federal troops to those which suggest that a modest number of United States marshals or FBI agents be strategically placed to help protect civil rights workers.

All of these proposals raise mixed problems of law, policy, and practicality. The purpose of this memorandum is to clarify those problems.

## I. The Legal Background

In general, federal law enforcement efforts have traditionally been designed to supplement and support the efforts of state law enforcement personnel rather than to replace them. Under the Constitution, the states have exclusive jurisdiction over most aspects of law enforcement. While there are many federal criminal statutes, they deal for the most part with specialized matters and have little relevance to the basic problem of maintaining order in the community in the sense of preventing violence. It is state and local law which defines and punishes crimes such as

---

[*] Editor's Note: This memorandum was accompanied by a cover memorandum of that same date for Lee White, the Special Assistant to the President, from Deputy Attorney General Katzenbach, stating as follows:

> Here is the memorandum for the President which he requested. I am transmitting it through you so you will have an opportunity to read it first and explain anything in it that is not clear, or express any views which you may have which differ from these. As the memorandum indicates, I think it is unwise for the President to publicly state that there is a lack of legal authority, since this forces disputes on the wrong issues.

murder, assault, rioting, disturbing the peace, vandalism, and so on, which seldom also involve violations of federal law. As a result, in part because of this traditional allocation of responsibilities, and in part because of the historic policy against the development of a federal police force, the federal government is ill equipped—in terms both of laws and of personnel—to perform ordinary police functions.

Federal law enforcement personnel have authority only to enforce federal law, and the statutes available to them for use in the Mississippi situation present some technical difficulties. The two statutes most likely to be involved are 18 U.S.C. § 241 (conspiracy against rights of citizens) and 18 U.S.C. § 242 (deprivation of rights under color of law). Both statutes have been narrowly construed by the Supreme Court. Although it was possible to use section 241 to make the recent arrests in Itta Bena, Mississippi, that was a case involving threats where the threats themselves showed the intent to interfere with the right to vote which is an element of the offense. In the usual case involving an act of violence, such evidence can usually be secured only by painstaking investigation. The second statute, section 242, applies to acts of state or local officials, done "under color of law," and requires a showing that the act was done with a "specific intent" to deprive the victim of a constitutional right. It is, therefore, difficult to secure the necessary evidence to gain a conviction under section 242 even in what seem to be flagrant cases.

What has been said does not mean that there would be any specific legal objection to sending federal civilian personnel to guard against possible violations of federal law. Both United States marshals and agents of the FBI are authorized by statute to carry firearms and to make arrests without warrant where there is "probable cause" to believe that a federal offense has been committed. And while the prospect is that few convictions could be obtained, it is likely that in many or most instances of violence directed against civil rights workers there would be sufficient cause to investigate and probably enough evidence of a violation of federal law to justify making an arrest.

## II. Use of Civilian Personnel for Police or Guard Duties

There are in the federal service approximately 600 deputy marshals assigned to the 93 judicial districts of the United States. Although they have broad authority to execute federal laws, as noted above, their normal duties are to maintain order in federal courts, serve subpoenas and other documents, maintain custody of federal prisoners undergoing trial, and occasionally to make arrests pursuant to an arrest or indictment.

The Attorney General has the authority to deputize additional persons to serve as federal deputy marshals. He can, therefore, deputize members of the Border Patrol, the Bureau of Prisons, the Alcohol and Tobacco Tax Units of the Internal Revenue Service, or others with law enforcement training. The only limitation on this authority is that he may not deputize personnel of the Army or Air Force.

(Oddly, by legislative oversight, this restriction does not technically apply to personnel of the Navy or Marine Corps.)

With respect to the regular deputy marshals, their limited number and the fact that they do not routinely work together as a force in law enforcement activity limit their usefulness for any broad-scale assumption of responsibility for maintaining order. The use of 130 deputy marshals for a period of several days in Oxford, Mississippi placed a severe strain on the marshal service throughout the nation and was not notably effective from a law-enforcement point of view. Simply in terms of the number of men required, it would not be feasible to provide protection by marshals to any substantial number of civil rights workers comparable to that provided to James Meredith during the period when he was in Oxford.

For a period of several days during the Oxford crisis the force of deputy marshals on the scene amounted to approximately 400. Some 270 of these were specially deputized prison guards and members of the Border Patrol.

In general, the effectiveness of all marshals in Mississippi would be hampered by their unfamiliarity with the geography and the population of the area. Also, they would be hampered by the absence of power to enforce local law. Local law enforcement personnel are aided in breaking up dangerous situations by their ability to round up groups of people and arrest them on such charges as loitering, disturbing the peace, obstructing traffic, etc. This technique would not, of course, be available to marshals and the fact that conviction is so unlikely under federal law would undermine the effectiveness of arrests generally. Aside from these considerations, there is a whole range of practical problems as to what the marshals' responsibilities would be in various situations, particularly if the civil rights workers who are being protected should insist upon engaging in activities which are regarded by federal authorities as unwise or improper. If federal personnel accompany civil rights workers wherever they go, the federal government will undoubtedly be held responsible by the local population for whatever the civil rights workers see fit to do, regardless of whether the federal government approves or is in a position to control what is done.

There is another practical problem, however, which is the crux of the matter. The experience of the Department in the Oxford, Mississippi crisis and in the several disturbances in Alabama convinced all those who participated that the most crucial factor in maintaining law and order in a community gripped by racial crisis is the support of state and local law enforcement officers. If they are clearly determined to support law and order, the prospects of violence are considerably reduced. If they encourage violence or abdicate responsibility for law enforcement functions, violence on a substantial scale is virtually certain to occur and the possibility of maintaining order by any means short of the use of federal troops becomes negligible. Once local law enforcement ceases to function in any sizable area, the number of personnel required to maintain control without the actual use of weapons exceeds the manpower resources of every branch of the federal service except the military. It is essential, therefore, to encourage state and local law

enforcement agencies to carry out their responsibilities and, if at all possible, to avoid using federal personnel in such a way so as to provide an excuse for abandonment of responsibility by such agencies.

If marshals or agents of the Bureau are used in any obvious way as guards in Mississippi, without the active support and cooperation of local officials, local law enforcement will tend to break down. This is not merely because local officials resent the intervention of outsiders, although that is an obvious factor. The fact is that in Mississippi the use of federal law enforcement personnel, particularly marshals, is regarded by the public as provocative and might well give rise to more breaches of the peace than would otherwise occur. Particularly if the civil rights workers involved engage in demonstrations and other mass activities while accompanied by marshals, their function will soon cease to be one of preventing clandestine violence and become one of maintaining public order among considerable numbers of people over a large area. In that situation, our experience is that without the support of local officials the maintenance of order requires the use of troops.

### III. Use of Troops

The federal statutes relevant to the use of military force in connection with civil disturbances are 10 U.S.C. §§ 331–34. Section 331 authorizes the President to supply armed forces at the call of a state legislature or governor to suppress an insurrection. Sections 332 and 333 authorize the President to use the armed forces without a request by state or local authorities in order to enforce federal law. Section 334 provides that whenever the President considers it necessary to use the armed forces pursuant to the three preceding sections of the Code, "he shall, by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time."

The purpose of section 331, following the pattern of federal criminal law generally, obviously is to supplement and support state and local law enforcement. Sections 332 and 333, which are quoted in full at the end of this memorandum at Tabs A and B, are designed to deal with situations where state and local law enforcement have completely broken down, either because local officials are themselves opposing and obstructing federal law or because they are unable or unwilling to control private groups that are in command of the situation.

Sections 332 and 333 appear on their face to confer broad authority to use troops to enforce federal law generally, whenever the President deems it necessary. They are limited, however, by the Constitution and by tradition. Thus the principal constitutional basis for the use of sections 332 and 333 in connection with racial disturbances is the Fourteenth Amendment, for the only federal law involved in such disturbances is that Amendment and federal statutes or court orders which are directly or indirectly based upon it. The Amendment is, of course, directed against "state action" and does not normally apply to the acts of

private persons. Aside from this consideration, the use of military force to execute the laws has traditionally been regarded with disfavor—as a course of action that can be lawfully and properly pursued only as a last resort. Bennett Milton Rich, in *The Presidents and Civil Disorder* (1941), summarized many precedents as well as much legislative history, policy, and tradition when he said:

> Unless there is some special reason which seems to make imperative the immediate use of the troops, or until all efforts to effect a peaceful settlement have failed and violence threatens of a nature beyond the ability of the local and state governments to control, the president is wise to avoid recourse to force. To use the troops only when no other solution seems possible has been the most frequent presidential practice—a practice the value of which is attested by the fact that it has met with complete success.

*Id.* at 219.

For the foregoing reasons, sections 332 and 333 have always been interpreted as requiring, as a prerequisite to action by the President, the conditions described above: that state authorities are either directly involved, by acting or failing to act, in denials of federal rights of a dimension requiring federal military action, or are so helpless in the face of private violence that the private activity has taken on the character of state action. The degree of breakdown in state authority that is required undoubtedly is less where a federal court order is involved, for there the power of the federal government is asserted not simply to enforce the Fourteenth Amendment, but to defend the authority and integrity of the federal courts under the Supremacy Clause of the Constitution. But where no court order is involved, reliance must be placed on the premise that those engaging in violence are either acting with the approval of state authorities or have, like the Klan in the 1870s, taken over effective control of the area involved.

In every recent use of authority under sections 332 and 333, a court order has been involved. Moreover, the President has noted either that the duly constituted authorities of the state were themselves opposing and obstructing the enforcement of federal law or had declined to provide adequate assurances that law and order would be maintained. Should these conditions not be present, we think the situation must be one which, in the judgment of the President, involves a serious and general breakdown of the authority of state and local government in the area affected.

There are, of course, immense practical problems involved in the use of troops, of which possibly the worst one is that it becomes difficult to find a way to withdraw. Local authorities tend to abdicate all law enforcement responsibility, leaving the troops without adequate legal tools—short of a declaration of martial law—to perform routine law enforcement functions for which they have little training.

## IV. Conclusion

The group of professors which has publicly taken issue with the statement attributed (inaccurately) to the Attorney General that there was no adequate legal basis for federal law enforcement in Mississippi is hard to dispute. They assume the complete breakdown of state law enforcement as a result of Klan activity and Klan connections with local sheriffs and deputies. On that factual assumption the President could, as a legal matter, invoke the authority of sections 332 and 333. There is, of course, considerable information available that could be used to support that assumption as to some areas in Mississippi. But in view of the extreme seriousness of the use of those sections, I believe that the government should have more evidence than it presently has of the inability of state and local officials to maintain law and order—as a matter of wisdom as well as of law. Furthermore, vigorous investigation and prosecution where federal crimes are involved may serve, in conjunction with state police action, to forestall the serious breakdown which those sections of the statute contemplate.

As indicated above, the problems of using large numbers of federal civilian law enforcement personnel are more practical than legal. So long as they confine themselves to investigation and prosecution of federal crimes, there is no legal problem. The practical problem is whether their presence serves to aggravate the emotions of the populace or alienate local law enforcement officials. Marshals, in addition to problems of availability and training, would likely aggravate the problem. Increase of FBI personnel, along the lines previously followed, is not likely to have the same result and constitutes the more effective course of action that can be followed at the present time.

NICHOLAS deB. KATZENBACH
*Deputy Attorney General*
